1  SEYFARTH SHAW LLP
   Andrew M. Paley (SBN 149699) apaley@seyfarth.com
2  Hayley E. Macon (SBN 224530) hmacon@seyfarth.com
   2029 Century Park East, Suite 3300
3  Los Angeles, California 90067-3063
   Telephone: (310) 277-7200
4  Facsimile: (310) 201-5219

5

6  Attorneys for Defendants
   DOMINO'S PIZZA LLC

7

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  PERFECTO ESPINOZA AND CESAR        ) Case No. EDCV 07-1601-VAP (OPx)
    PEDROZA, individually and on behalf )
12  of all others similarly situated,,   ) **DEFENDANT'S OPPOSITION TO**
                                        ) **PLAINTIFFS' MOTION FOR**
13            Plaintiffs,               ) **CLASS CERTIFICATION**
                                        )
14      v.                             ) Hon. Virginia A. Phillips
                                        )
15  DOMINO'S PIZZA, LLC, a Michigan     )
    Limited Liability Company; DOMINO'S )
16  PIZZA DISTRIBUTION, LLC, a          )
    Michigan Limited Liability Company; )
17  and DOES 1-100, inclusive,          )
                                        )
18            Defendants.               )
                                        )
19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────
       DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.1

Table of Contents

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

II.  SUMMARY OF RELEVANT FACTS .......................................................... 2

    A.   Types of Routes and Route Times .............................................. 3

    B.   Drivers' Workday ......................................................................... 7

        1.   Logging In and Pre-Trip Inspection .......................... 7

        2.   Checking the Load ...................................................... 6

        3.   Routes .......................................................................... 8

    B.   Pay Structure ............................................................................... 9

    C.   Domino's Meal Period Policy ..................................................... 9

    D.   The Named Plaintiffs ................................................................. 11

III. LEGAL ARGUMENT ............................................................................ 10

    A.   Plaintiffs Cannot Establish Requirements for Class Certification. ..... 10

    B.   Plaintiffs' Meal Period Claim Is Not Subject to Collective Proof. ..... 11

        1.   Domino's Met Its Legal Obligation By Making Meal Periods Available to Drivers and Route Pros ........................ 11

        2.   Plaintiffs Cannot Show Commonality Under FRCP 23(a)(2). 15

        3.   Individualized Issues Predominate Over Any Common Issues. 18

    C.   Plaintiffs' Claim for Unpaid Wages Cannot Be Certified ................. 20

        1.   The Named Plaintiffs' Claims for Unpaid Wages Are Not Typical of the Putative Class ...................................... 20

        2.   Plaintiffs Fail To Provide Evidence That Unpaid Wages for Pre- and Post-Trip Inspection Is a Common Issue ................... 21

    D.   Class Certification of Plaintiffs' Wage Statement Claim Is Improper Because Individualized Issues Predominate ........................ 21

        1.   Recovery Under Labor Code § 226 Requires Actual Injury. .. 22

        2.   Whether Putative Class Members Suffered Actual Injury Is an Individualized Issue. ................................................. 23

        3.   Plaintiffs' Wage Statement Claims Are Not Typical ............... 23

i

<u>Table of Contents</u>
(continued)

<u>Page</u>

E.   A Class Action Is Not The Superior Method for Litigating These Claims. ......................................................................................... 23

F.   Plaintiffs Have Not Provided Evidence That They Will Adequately Represent the Interests of the Putative Class ..................................... 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brown, et al. v. Federal Express Corp., et al.,*
   249 F.R.D. 580 (C.D. Cal. 2008) ........................................................... 15, 17

*Doninaer v. Pacific Northwest Bell, Inc.,*
   564 F.2d 1304 (9th Cir. 1977) ...................................................................... 12

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974) ....................................................................................... 12

*Elliot v. Spherion Pacific Work, LLC,*
   572 F. Supp. 2d, 1169 (C.D. Cal. 2008) ...................................................... 24

*General Tele. Co. of S.W. v. Falcon,*
   457 U.S. 147 (1982) ................................................................................. 12, 25

*Hunt v. Check Recovery Sys., Inc.,*
   241 F.R.D. 505 (N.D. Cal. 2007) .......................................................... 11, 12

*Kenny v. Supercuts, Inc., et al.,*
   252 F.R.D. 641 (N.D. Cal. 2008) ................................................................. 16

*Kohler, et al. v. Hyatt Corp.,*
   2008 U.S. Dist. LEXIS 63392 (C.D. Cal. 2008) ........................................ 16

*Perez v. Safety-Kleen Systems, Inc.,*
   253 F.R.D. 508 (N.D. Cal. 2008) ................................................................. 16

*Salazar, et al. v. Avis Budget Group, Inc., et al.,*
   251 F.R.D. 529 (S.C. Cal. 2008) ................................................................. 16

*White v. Starbucks,*
   497 F. Supp. 2d 1080 (N.D. Cal. 2007) ................................................ 15, 17

## STATE CASES

*Brinker Restaurant Corp., et a. v. Sup. Ct. of San Diego County
   (Hohnbaum),*
   165 Cal. App. 4th 25 (2008) ......................................................................... 13

*Brinkley v. Public Storage, Inc.,*
   167 Cal. App. 4th 1278, 84 Cal. Rptr. 3d 873 (2008) ....................... 14, 15, 24

*Cicairos v. Summit Logistics, Inc.,*
   133 Cal. App. 4th 949 (2005) ............................................................ 14, 15, 16

*Gabriella v. Wells Fargo Financial, Inc.,*
   2008 WL. 3200190 (N.D. Cal. 2008) ........................................................... 16

*Murphy v. Kenneth Cole Prods., Inc.,*
   40 Cal. 4th 1094 (2007) .......................................................................... 13, 14

# FEDERAL STATUTES

49 C.F.R. § 395.3 ...................................................................3, 4 5, 6

49 C.F.R. §398.4(h) ..................................................................10

FRCP 23........................................................................................12

FRCP 23(a)(1)-(4)........................................................................12

FRCP 23(a)(1)...............................................................................13

FRCP 23(a)(2)...............................................................................16

FRCP 23(b)....................................................................................12

FRCP 23(b)(3) ........................................................................12, 25

FRCP. 23(a)(4)..............................................................................28

# STATE STATUTE

Cal. Code of Civ. Proc. § 340 ...........................................................23

Labor Code § 226 ...........................................................2, 22, 23 25

Labor Code § 226(a)...........................................................................23

Labor Code 226(e) .....................................................................23, 24

Labor Code § 226.7.................................................................13, 15

Labor Code § 512 ........................................................ 13, 15, 16, 18

Labor Code § 512(a)........................................................................12, 13

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' meal period claim is ineligible for class treatment. Domino's policy is to allow the putative class Drivers and Route Pros to take breaks whenever they are hungry or tired. This policy was effectively communicated both orally and in writing. California state and federal courts have consistently held that employers meet their legal obligation by making meal periods available to employees. Although Plaintiffs claim that they did not have time to take meal breaks, the actual route data complied from the Drivers' logs demonstrates that there was ample time for Plaintiffs and the putative class members to have taken all required breaks and still complete their routes within Department of Transportation ("DOT") limits. The precise reason why any putative class member did or did not take a 30-minute off-duty meal period during each shift worked requires an individualized inquiry. Further, Plaintiffs have offered no evidence of their meal period allegations for putative class members working out of Domino's Northern California facility.

Plaintiffs' claim for unpaid wages is also inappropriate for class treatment. Plaintiffs incorrectly assume that because prior to 2005, payment for pre- and post-trip inspections was not separately coded on Drivers' pay stubs, Domino's did not pay Drivers for these inspections. In fact, Drivers have always been paid for these inspections. Prior to 2005, the payment was simply factored in to the weight and mileage rates paid to Drivers. Neither Plaintiff was a Driver during the time period when pre- and post-trip inspection time was not separately coded. Plaintiffs cannot, therefore, represent a putative class with respect to this claim. Plaintiffs also offer no evidence supporting these allegations for employees at Domino's Northern California facility. In light of Domino's lawful pay practices, any claim that Domino's failed to pay a Driver for time worked is an inherently individualized analysis.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

1   Plaintiffs' claim regarding inaccurate wage statements also fails to meet the

2   requirements for class certification.  Actual injury is required for recovery under

3   Labor Code Section 226.  Whether putative class members received inaccurate

4   wage statements and suffered injury requires individualized inquiry.  Moreover, to

5   the extent that this claim is based upon alleged unpaid wages for non-drive time,

6   the one-year statute of limitations has elapsed and Plaintiffs cannot recover on a

7   class-wide basis or otherwise.

8   **II.   SUMMARY OF RELEVANT FACTS**

9   Domino's has two California supply chain centers ("SCCs"), one in Ontario

10  (the Southern California Supply Chain Center or "SCASCC") and one in Hayward

11  (the Northern California Distribution Center "NCASCC").[1]  Domino's dispatches

12  large delivery trucks from these two distribution centers six days a week to deliver

13  pizza ingredients and supplies to franchise stores throughout California.[2]  Drivers

14  dispatched from the SCASCC make deliveries from Southern California through

15  Central California.  Drivers dispatched from the NCASCC make deliveries

16  primarily in Northern California.[3]  On some routes dispatched from the SCASCC,

17  Route Pros are assigned to help the Drivers unload at each stop.[4]  There are no

18  Route Pros at the NCASCC, which is a smaller SCC than the SCASCC.[5]  There are

19  currently 42 Drivers at both of Domino's California Distribution Centers.[6]  Thirty-

20  one of those Drivers are based out of the SCASCC and 11 of those Drivers are

21  based out of the NCASCC.[7]  There are currently 11 Route Pros, all based out of the

22  SCASCC.[8]

---

[1] Declaration of Dan Charboneau ("Charboneau Dec.") ¶ 2.
[2] Charboneau Dec. ¶ 2.
[3] Charboneau Dec. ¶ 2.
[4] Charboneau Dec. ¶ 2.
[5] Charboneau Dec. ¶ 2.
[6] Charboneau Dec. ¶ 3.
[7] Charboneau Dec. ¶ 3.
[8] Charboneau Dec. ¶ 3.

## A.    Types of Routes and Route Times

Domino's plans driving routes to the various stores and assigns Drivers and Route Pros to various types of routes based on the amount of product to be delivered and an estimate of the time required to complete the deliveries.  The Department of Transportation's ("DOT") regulations prohibit Drivers from driving (*including all stop time on a route for deliveries, meals, or any other purpose*) for more than 14 hours straight without 10-hours off-duty.[9]  If Drivers are not able to complete their route in 14 hours, Domino's instructs them to either return to the SCC without making all their deliveries or to pull over and wait for another Driver who has driving hours left to come "rescue" him.[10]  This "rescue driver" will come to where the Driver is located and either complete his route or drive his truck back to the SCC.[11]  Domino's does not discipline its Drivers for needing to be rescued on occasion.[12]  Drivers, however, are subject to discipline if they continue driving past the 14 hours permitted by the DOT because that involves a violation of the law.[13]

Domino's assigns a single Driver to "local" routes that will take less than 14 hours to complete, considering the geographic distance, the number of stops, and the amount of product to be unloaded at each stop.[14]  A Driver and a Route Pro are assigned to local routes dispatched from the SCASCC that will take less than 14 hours to complete, but have more product to unload.[15]  There are no Route Pros at the NCASCC.[16]  The Route Pro helps the Driver unload at each stop in order to

---

[9] 49 CFR § 395.3; Charboneau Dec. ¶ 4.
[10] Charboneau Dec. ¶ 20.
[11] Charboneau Dec. ¶ 20.
[12] Charboneau Dec. ¶ 20; Declaration of Alberto Lopez ("Lopez Dec.") ¶ 7; Declaration of George Miguel ("Miguel Dec.") ¶ 8; Declaration of Isaac Phillips ("Phillips Dec.") ¶ 6.
[13] Charboneau Dec. ¶ 20.
[14] Charboneau Dec. ¶ 4-5.
[15] Charboneau Dec. ¶ 5.
[16] Charboneau Dec. ¶ 2.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

ensure that the route can be completed in less than 14 hours, but is not authorized to help drive the truck.[17]

For routes that cannot be completed within 14 hours, Domino's may still assign a single Driver, but that Driver has up to 14 hours to complete the first half of his route. That Driver takes a 10-hour rest overnight, and then has 14 additional hours the next day to complete the balance of his route.[18] The layover time is included in the Drivers' overall route time for that route, but does not count against his 14 hours of permissible drive time.[19] Thus, Drivers on layover routes have 38 hours to complete their route.

Otherwise, Domino's assigns two Drivers to non-local routes that cannot be completed in less than 14 hours due to the mileage of the route and the amount of product to be unloaded.[20] Because there are two Drivers on the route, the Drivers can each use their DOT-regulated 14-hours of drive time to complete the route, although the routes do not take 28 hours to complete.[21] During times when both Drivers are "on duty," both help unload the truck at stops along the route.[22] If one of the Drivers is "off duty" and his time is not counted against the 14 hours of drive time permitted under the DOT regulations, he rests in the truck's sleeper berth and cannot assist the other Driver in unloading the truck.[23]

The average time it takes to run each type of route varies, as does the average amount of unused DOT permitted driver hours:

<u>Single-Driver, Non-Layover Routes</u>: Drivers have 14 hours of available DOT-permitted drive time on these routes.[24] During 2007, the average time it took a SCASCC Driver to complete such a route was 9:17:52.[25] In 2008, that number

---

[17] Charboneau Dec. ¶ 5.
[18] Charboneau Dec. ¶ 6.
[19] Charboneau Dec. ¶ 6
[20] Charboneau Dec. ¶ 7.
[21] Charboneau Dec. ¶ 7.
[22] Charboneau Dec. ¶ 7.
[23] Charboneau Dec. ¶ 7.
[24] 49 CFR §395.3; Charboneau Dec. ¶ 5.
[25] Declaration of Laurie Schwartzenberger ("Schwartzenberger Dec.") ¶ 10(a).

1   was 10:23:00.[26]  For Drivers at the NCASCC in 2007, it took them an average of

2   9:29:00 to complete such a route.[27]  In 2008, it took them an average of 11:29:00.[28]

3   Thus, Drivers on an average route had more than four hours of available drive time

4   when they completed their routes.

5       Single-Driver/Route Pro Routes:  Drivers also have 14 hours of available

6   DOT-permitted drive time on these routes.[29]  During 2007, the average time for

7   Drivers and Route Pros at the SCASCC to run these routes was 12:00:00.[30]  During

8   2008, the average time for Drivers and Route Pros at the SCASCC to run these

9   routes was 12:13:02.[31]

10       Single-Driver Layover Routes:  Drivers have a total of 38 hours to complete

11   these routes, including two 14-hour sessions of DOT-permitted drive time with an

12   intervening rest of at least ten hours.[32]  For SCASCC Drivers on layover routes in

13   2007, the average time, including the layover time, was 29:22:24; in 2008 it was

14   30:47:14.[33]  For NCASCC Drivers on layover routes in 2007, the average time,

15   including layover time, was 34:31:33; in 2008 it was 32:30:56.[34]  Thus, Drivers

16   had between three and eight hours of available drive time after completing these

17   routes.

18       Team Routes:  The two Drivers on a team route have a total of 28 hours of

19   DOT permitted drive time.[35]  The average time for SCASCC Drivers to complete

20   such a route in 2007 was 15:52:38; in 2008 it was 17:01:34.[36]  For NCASCC

21

22   The average route times for each of the route types discussed herein include the actual break time taken by drivers.  Thus, in reality, these averages underestimate the time available to complete the routes within the DOT limits.

23   [26] Schwartzenberger Dec. ¶ 10(e).
    [27] Schwartzenberger Dec. ¶ 10(i).

24   [28] Schwartzenberger Dec. ¶ 10(l).
    [29] 49 CFR §395.3; Charboneau Dec. ¶ 5.

25   [30] Schwartzenberger Dec. ¶ 10(c).
    [31] Schwartzenberger Dec. ¶ 10(g).

26   [32] 49 CFR §395.3; Charboneau Dec. ¶ 6.
    [33] Schwartzenberger Dec. ¶ 10(b), 10(f).

27   [34] Schwartzenberger Dec. ¶ 10(j), 10(m).
    [35] 49 CFR §395.3; Charboneau Dec. ¶ 7.

28   [36] Schwartzenberger Dec. ¶ 10(d), 10(h).

1   Drivers, the average time was 21:51:34 in 2007 and 23:13:52 in 2008.[37] Thus,

2   Drivers had between approximately five and 14 hours of available drive time after

3   completing these routes.

4          In addition to variations in distance and amount of product to unload, the

5   routes also vary in other respects such as whether the routes: (1) are run with a

6   Driver and/or Route Pro who prefers to stop for meals (2) are urban or rural, (3) are

7   mountainous or flat; (4) are predominately commercial; (5) have adequate parking

8   for the delivery truck; (6) are run during the day or night; (7) are an assigned route

9   that the Driver and/or Route Pro regularly runs; (8) are run with a Driver or Route

10  Pro who works faster or slower; and (9) are affected by weather conditions.[38]

11  While it is clear that, on average, all routes were completed well under the DOT

12  limits, each of the foregoing factors can affect how long it takes to complete a

13  route on a particular day.

14         Drivers at the SCASCC are assigned to routes through a bidding process that

15  considers seniority and delivery accuracy numbers.[39] Drivers at the bid for routes

16  every few months.[40] There is no limitation on the number of times a Driver can

17  bid for or be assigned to a particular route, so Drivers with more seniority and

18  higher delivery-accuracy numbers may be assigned to the same route repeatedly.[41]

19  Drivers at the NCASCC are assigned regular routes without bidding.[42] As a result,

20  Drivers in that location may be assigned to the same routes for years.[43] Route Pros

21

22  [37] Schwartzenberger Dec. ¶ 10(k), 10(n).
    [38] Declaration of Joel Bugarin ("Bugarin Dec.") ¶ 5 (drives in the mountains and
23  may have to stop the truck and apply chains to the wheels to drive safely and
    legally); Declaration of Harold Fermon ("Fermon Dec.")(likes driving alone
24  because some drivers work faster or slower and he likes to set his own route pace);
    Phillips Dec ¶ 3 (schedules delivery to stores where parking is difficult for a time
25  when traffic is light); Declaration of Dean Sherman ("Sherman Dec.") ¶ 9 (routes
    take longer on Mondays when there is tray pick up).
26  [39] Charboneau Dec. ¶ 8; Miguel Dec. ¶ 4.
    [40] Charboneau Dec. ¶ 8.
27  [41] Charboneau Dec. ¶ 8.
    [42] Charboneau Dec. ¶ 8; Miguel Dec. 4.
28  [43] *Id.*

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

1  are assigned to particular routes based on business needs, although they typically

2  accompany the same drivers on the same set of routes during a bidding cycle.[44]

3  **B.    Drivers' Workday**

4  **1.    Logging In and Pre-Trip Inspection**

5  Drivers begin their workday by picking up their route bags and heading to

6  their truck, where they log in to PeopleNet, an on-board computerized Driver log

7  that records their time.[45]  Route pros also log their time in PeopleNet.[46]  Drivers

8  perform a pre-trip inspection of their truck, as is required by DOT regulations and

9  by Domino's policy.[47]  The actual amount of time that the pre-trip inspection takes

10  varies.[48]  Some drivers spend as little as a few minutes on it, while others spend as

11  much as 30 minutes.[49]  Pursuant to Domino's timekeeping policy of paying

12  employees for all hours worked, this time for a pre-trip inspection has always been

13  paid, although it was not broken down under a separate payroll code until

14  September 2005.[50]  On routes where there are two Drivers, both Drivers are paid

15  for the pre-trip inspection time, even though only one Driver actually performs it.[51]

16  Time for pre-trip inspection is currently paid at a down-time rate of $18.00 per

17  hour.[52]

18  **2.    Checking the Load**

19  Since the beginning of 2006, Drivers also make sure that the product loaded

20  in their truck is what the stores on their route actually ordered.[53]  This check

21  typically takes 30 minutes or less on Single-Driver routes and 45 minutes on Team

22

23  _____

24  [44] Charboneau Dec. ¶ 8.
    [45] Charboneau Dec. ¶ 14.
    [46] Charboneau Dec. ¶ 14.

25  [47] Charboneau Dec. ¶ 10; Miguel Dec ¶ 9; Phillips Dec. 4.
    [48] Miguel Dec ¶ 9; Phillips Dec. 4.

26  [49] *Id.*
    [50] Charboneau Dec. ¶ 10.

27  [51] Charboneau Dec. ¶ 10.
    [52] Charboneau Dec. ¶ 10.

28  [53] Charboneau Dec. ¶ 11.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

1  routes.[54]  Drivers have always been a paid for this time at the down-time rate,

2  separate from their pre-inspection pay.[55]

### 3. Routes

4  Inside the route bag is a route plan, keys to the stores along the route,

5  invoices showing what those stores ordered, and relevant DOT regulations.  The

6  route plan includes various information including a proposed order in which the

7  Driver should stop at the stores, the weight of product that the store is to receive,

8  and the number of trays that are to be picked up.[56]  The routes are fairly

9  standardized, although some of the stores along that route may vary based on the

10  amount of product ordered by any particular store.[57]  Drivers do not run the same

11  route every day of the week, but usually have two or three different routes per

12  week.[58]  For example, Drivers may run the same route on Monday, Wednesday,

13  and Friday, but a different route on Tuesdays and Thursdays.  These routes remain

14  reasonably constant for several months.[59]

### B. Pay Structure

16  Domino's timekeeping and pay policies are set forth in its employee

17  handbook, which is distributed to all employees.[60]  Drivers are paid based on a

18  combination of the weight of the load they deliver to stores and the mileage they

19  drive to make those deliveries.[61]  Prior to September 2005, Drivers' pay was listed

20  in a single rate specifying weight and mileage.[62]  This payment included all work

21  that Drivers performed before, during, and after their routes.[63]  After September

---

22  [54] Miguel Dec. ¶ 5.
   [55] Charboneau Dec. ¶ 10.

23  [56] Charboneau Dec. ¶ 9.
   [57] Charboneau Dec. ¶ 9.

24  [58] Declaration of Edgar ("Diaz Dec.") ¶ 4 (runs one route Mondays, Wednesdays, and Fridays and a different route on Saturdays); Declaration of Paul Namo ("Namo

25  Dec.") ¶ 3 (runs same route on Wednesdays and Fridays, but different routes on Mondays, Tuesdays, and Thursdays).

26  [59] Bugarin Dec. ¶6.
   [60] Charboneau Dec. ¶ 13.

27  [61] Charboneau Dec. ¶ 10.
   [62] Charboneau Dec. ¶ 10.

28  [63] Charboneau Dec. ¶ 10.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

2005, Domino's began separating out the various tasks into different payroll codes.[64] The payment for the route itself is based on weight and mileage.[65] All other job duties performed before and after the route are paid at a downtime rate of $18.00 per hour.[66] Drivers are paid one hour total for pre- and post-trip inspection time, even though those inspections usually take less time.[67] If the inspection takes more time, Drivers can request additional payment.[68] Route Pros are paid either an hourly rate or based on the weight and mileage they deliver, whichever is greater.[69]

Drivers record their time through the on-board computer system, PeopleNet.[70] This system records Drivers route data, including all on-duty time, which is comprised of both drive time, and non-drive time.[71] Through these designations on PeopleNet, Drivers create a Driver log, as is required under both Domino's policy and the DOT's regulations.[72] The Driver log lists the time the Driver logs in, the time he begins driving, the time he makes each stop, the time he begins driving after each stop, and the time he logs out.[73]

If Drivers incur time beyond that recorded in PeopleNet, the standard flat fees for pre- and post-trip inspection, and counting their load, they are instructed to write that out on the invoice envelope in their route bag and Domino's pays Drivers for the additional time at a down-time rate.[74]

## C. Domino's Meal Period Policy

Domino's consistently has made meal periods available to Drivers and Route Pros. Domino's meal period policy is contained in its policy manual.

---

[64] Charboneau Dec. ¶ 10.
[65] Charboneau Dec. ¶ 10.
[66] Charboneau Dec. ¶ 10.
[67] Charboneau Dec. ¶ 10.
[68] Charboneau Dec. ¶ 10.
[69] Charboneau Dec. ¶ 12.
[70] Prior to 2005, Drivers recorded their time in a similar on-board computer system called CADEC.
[71] Charboneau Dec. ¶ 14.
[72] Charboneau Dec. ¶ 14.
[73] Schwartzenberger Dec. ¶ 3.
[74] Charboneau Dec. ¶ 15.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

1  California employees are provided with a 30-minute, off-duty meal period for all

2  shifts where the employee was scheduled to work more than five hours.[75]  If the

3  team member worked more than 10 hours during a shift, they are provided with a

4  second 30-minute off-duty meal period.[76]  Domino's made its policy manual,

5  containing its meal period policy, available to Drivers and Route Pros in the both

6  SCCs at all times.[77]

7      Domino's also distributes copies of the Federal Motor Carrier Handbook to

8  its Drivers and has a copy available in the payroll office at all times.[78]  The

9  Handbook contains 49 CFR §398.4(h).  That regulation provides: "Every carrier

10  shall provide for reasonable rest stops at least once between meal stops.  Meal

11  stops shall be made at intervals not to exceed six hours and shall be for a period of

12  not less than 30 minutes duration."[79]  Drivers are required to know the DOT safety

13  regulations in order to maintain their Class A Drivers licenses.[80]  For example,

14  Pedroza testified that he was aware that he was entitled to take breaks.[81]  Domino's

15  also posted Industrial Welfare Commission Wage Order 9, including its provision

16  regarding meal periods, in both the distribution center break rooms and the

17  Drivers' lounges.[82]

18      Domino's also told Drivers to stop for meals if they were hungry.[83]  In fact,

19  Plaintiff Espinoza testified that Sal Melgoza, operations director at the SCASCC,

20  told him that it was up to him if he wanted to take meal breaks.[84]  Distribution

21  center managers also told Drivers that if they were riding with a Route Pro who

22  

---

23  [75] Charboneau Dec. ¶ 15.
   [76] Charboneau Dec. ¶ 16.
   [77] Charboneau Dec. ¶ 16.
24  [78] Charboneau Dec. ¶ 16.
   [79] 49 CFR §398.4(h)
25  [80] Drivers also sign acknowledgments affirming that they understand the DOT
   safety regulations.  See Pedroza safety acknowledgment, attached as Exhibit 20 to
26  the Declaration of Hayley Macon, filed concurrently herewith.
   [81] Pedroza Dep. 137:2-17.
27  [82] Charboneau Dec. ¶ 17.
   [83] Charboneau Dec. ¶ 19.
28  [84] Espinoza Dep. 113:23-114:4.

---

10

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

wanted to stop for a meal, then they should stop.  Domino's managers never told its Drivers or Route Pros that they were not allowed to take meal breaks.[85]  Additionally, there were no managers directly supervising the Drivers and Route Pros along their routes.  It is entirely up to the Drivers and Route Pros when to stop for meals.[86]

### D.    The Named Plaintiffs

Plaintiff Espinoza was hired at the SCASCC in 1997 to work in the manufacturing and warehouse areas of the Distribution Center.  In May 1999, he was promoted to the position of Route Pro.  On January 22, 2006, he became a Driver.[87]  As a Driver, Espinoza regularly drove about eight routes.  Between late July 2006 and mid-July 2007, the average time it took him to run his routes was 11 hours and 50 minutes.[88]  On August 1, 2007 his employment was terminated for violating DOT regulations and Domino's policies by having an unauthorized person in his truck.  Espinoza never worked at Domino's NCASCC.

Plaintiff Pedroza was hired at the SCASCC as a Driver on October 11, 2006.[89]  Between January 2007 and October 2007, the approximate average time it took him to run his routes was eleven hours.[90]  He voluntarily terminated his employment October 23, 2007.  Pedroza never worked at Domino's NCASCC.

## III.   LEGAL ARGUMENT

### A.    Plaintiffs Cannot Establish Requirements for Class Certification.

Plaintiffs bear the burden of proving that the requirements of Federal Rule of Civil Procedure 23(a) have been met in order for a class to be certified.  These requirements include numerosity, commonality, typicality, and adequacy.  *Hunt v.*

---

[85] Charboneau Dec. ¶ 19.  Declaration of Pedro Franco ("P. Franco Dec.") ¶ 6; Declaration of Samuel Pattee ("Pattee Dec.") ¶ 6; Phillips Dec ¶ 5; Declaration of Dean Sherman ("Sherman Dec.") ¶ 11;
[86] P. Franco Dec. ¶ 6.
[87] Espinoza Dep. 14:24-15:14.
[88] Schwartzenberger Dec. ¶ 10(0) and 10(p).
[89] Pedroza Dep. 14:24-15:14.
[90] Schwartzenberger Dec. ¶ 10(r) and 10(s).

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

1  *Check Recovery Sys., Inc.*, 241 F.R.D. 505 (N.D. Cal. 2007). More specifically,

2  Plaintiffs must establish that: (1) the class is so numerous that joinder of all

3  members individually is impractical; (2) there are questions of fact and law

4  common to the class; (3) claims or defenses of the putative class representatives

5  are typically of the claims or defenses of the putative class; and (4) the putative

6  class representatives are able to fairly and adequately protect the interests of all

7  putative class members. FRCP 23(a)(1)-(4). The Supreme Court has directed

8  district courts to conduct a *"rigorous analysis"* to determine whether the

9  requirements of Rule 23 are met prior to certifying a class. *General Tele. Co. of*

10  *S.W. v. Falcon,* 457 U.S. 147, 161 (1982) (emphasis added). Plaintiffs bear the

11  burden of establishing that their action satisfies each of the four prerequisites of

12  Rule 23(a) and at least one subdivision of Rule 23(b). *See id.* at 161; *Doninaer*

13  *v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308-09 (9th Cir. 1977). Here,

14  Plaintiffs seek certification under FRCP 23(b)(3), which requires them to show

15  that questions of law or fact common to class members predominate.

16        Although for the purposes of class certification, Plaintiffs need not make a

17  prima facie showing that they will prevail on the merits of their claims, *Eisen v.*

18  *Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974), "the class determination generally

19  involves considerations that are enmeshed in the factual and legal issues comprising

20  the plaintiff's cause[,] ... [and] it may be necessary for the court to probe behind

21  the pleadings before coming to rest on the certification question." *Falcon,* 457

22  U.S. at 160.

23      **B.**    **Plaintiffs' Meal Period Claim Is Not Subject to Collective Proof.**

24          **1. Domino's Met Its Legal Obligation By Making Meal Periods**

25            **Available to Drivers and Route Pros.**

26  Labor Section 512(a) states:

27      An employer may not employ an employee for a work period of more
    than five hours per day without providing the employee with a meal

28      period of not less than 30 minutes, except that if the total work period

12

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LAI 6754071.2

per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.

Section 512(a) also provides for a second 30-minute meal period if the employee works ten hours.  Section 226.7 provides that employers may not "require" employees to work through meal or rest periods as specified in the applicable IWC Wage Order.

State and federal case law consistently interpret these requirements to mean that employers must only make meal periods available to employees, not actually require employees to take their meal periods.  Although the California Supreme Court has not interpreted the meaning of the word "provide" under Section 512,[91] it has strongly indicated that an employer violates Section 226.7 only if it forces an employee to forgo a meal break:

- An employer violates the law if an employee is "*forced to forgo* his or her meal … a benefit to which the law entitles him or her." *Murphy v. Kenneth Cole Prods., Inc.,* 40 Cal. 4th 1094, 1104 (2007) (emphasis added).

- "Under … section 226.7, an employee is entitled to the additional hour of pay immediately upon being *forced to miss a rest or meal break.*" *Id.* at 1108 (emphasis added).

- "[B]eing *forced to forgo rest and meal breaks* denies employees time free from employer control that is often needed to be able to accomplish important personal tastes." *Id.* at 1113 (emphasis added).

---

[91] The California Supreme Court has granted a petition to review *Brinker Restaurant Corp., et a. v. Sup. Ct. of San Diego County (Hohnbaum),* 165 Cal. App. 4th 25 (2008), which the held, among other things, that the proper interpretation of "provide" under Section 512 means employers must make meal periods available, not force employees to take those meal periods.

13

LA1 6754071.2

1    Consistent with *Murphy*, in *Brinkley v. Public Storage, Inc.*, 167 Cal. App.

2    4th 1278, 84 Cal. Rptr. 3d 873 (2008), the Court of Appeal held that an employer

3    meets its obligation to provide meal periods by providing employees with the

4    opportunity to take meal breaks.  In *Brinkley*, a former property manager for Public

5    Storage alleged that the employer failed to provide timely meal and rest periods

6    and issued inaccurate wage statements.  *Id.* at 877.  Although the employer had a

7    meal period policy providing for 30-minute off-duty meal periods for shifts of five

8    hours or more, class members did not always take those meal periods and did not

9    always take them within the first five hours of work.  *Id.* at 877.  The court held

10   that the employer only had to make meal periods available at some point during the

11   employees' shift.  The court expressly rejected the Plaintiff's argument that

12   employers are obligated to ensure that meal periods are actually taken.  *Id.* at 881.

13   The court also rejected the plaintiffs' argument that breaks had to be provided

14   within the first five hours of work.  *Id.* at 882.

15       *Brinkley* also clarified the holding in *Cicairos v. Summit Logistics, Inc.*, 133

16   Cal. App. 4th 949 (2005).  At issue in *Cicairos* was whether the employer provided

17   meal periods to truck drivers.[92]  There, the employer required drivers to account for

18   their time by manually inputting activity codes into an on-board computer system,

19   for various events and tasks such as road construction or heavy traffic, and based

20   compensation on those entries.  *Id.* at 962.  The employer, however, did not

21   provide an activity code for meal periods.  *Id.* at 962.  The employer managed and

22   scheduled the drivers' shifts in such a way that prevented the drivers from taking

23   meal periods, such as "pressuring" drivers to make more than one daily trip.  *Id.* at

24   962.  Relying on a non-binding Department of Labor Standards Enforcement

25   ("DLSE") Opinion Letter, *Cicairos* held that the employer had " 'an affirmative

---

[92] The facts in the instant matter are readily distinguishable from *Cicairos*.  First, Domino's does not force Drivers to entire various codes and pay is based on weight and mileage, not based upon what is entered into the on-board computer systems.  Nor does Domino's force Drivers to run additional daily routes.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

1  obligation to ensure that workers are actually relieved of all duty.'" *Id.* at 962.

2  *Brinkley* noted, however, that "the *Cicairos* Court did not find that the employer

3  had to ensure that employees actually took the meal period." *Brinkley*, 84 Cal.

4  Rptr. at 883.  Rather, the *Cicairos*' statement that employers had an obligation to

5  ensure that employees were relieved of all duties during meals is consistent with

6  the numerous cases holding that employers only need to make meal periods

7  available. *Id.* at 883-884.[93]

8       Federal decisions also confirm that an employer's obligation is only to make

9  meal periods available.  In *White v. Starbucks*, 497 F. Supp. 2d 1080, 1088-89

10  (N.D. Cal. 2007), the court concluded that, "the California Supreme Court …

11  would require only that an employer *offer* meal breaks, without forcing employers

12  actively to ensure that workers are taking these breaks."  The court further held that

13  "the employee must show that he was *forced to forego* his meal breaks as opposed

14  to merely showing that he did not take them regardless of the reason." *Id.*  The

15  court expressly rejected *Cicairos* because its holding was based entirely on a

16  DLSE opinion letter that interpreted only the rest break and meal period provisions

17  of the IWC wage order, not the plain language of Sections 226.7 and 512. *Id.*  The

18  court granted defendant's summary judgment and held that plaintiff failed to show

19  that Starbucks forced him to forego any of his meal or rest breaks.

20       Similarly, in *Brown, et al. v. Federal Express Corp., et al.*, 249 F.R.D. 580

21  (C.D. Cal. 2008), the court held that FedEx was only required to provide meal

22  breaks, not require that employees take them.  *Brown* involved a putative class of

23  FedEx delivery drivers, who were based out of a number of different California

24  dispatch centers and who ran different types of delivery routes. *Id.* at 586-587.

25  The routes involved multiple forms of variance including the level of monitoring,

26

27  [93] On October 23, 2008, the DLSE issued a memorandum to DLSE staff clarifying its position that Section 512 only requires employers to make meal periods available to its employees and not to ensure that meal periods are actually taken.

28  Memorandum re: Court Rulings on Meal Periods, DLSE (October 23, 2008).

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

1  whether the routes were urban or rural or mountainous, whether the routes

2  governed larger or smaller geographic distances, whether the routes were

3  residential or commercial, the number of stops along the routes, and the volume of

4  the work, which could vary from day to day based on what was being delivered.

5  *Id.* at 586-587.  Because FedEx was only required to make meal and rest breaks

6  available to plaintiffs, the court held that plaintiffs could prevail only if they

7  demonstrate that FedEx's policies deprived them of those breaks. *Id.* at 586.  The

8  court explained that any such showing required substantial individualized fact

9  finding and denied plaintiffs' class certification motion.  *Id.* at 586.

10       Likewise, in *Kenny v. Supercuts, Inc., et al.*, 252 F.R.D. 641, 646 (N.D. Cal.

11  2008), the district court held, "whatever 'fails to provide' in the Labor Code

12  means, it does not require an employer to ensure that an employee take a meal

13  break."  The court echoed the criticism of *Cicairos*.  *Id.* at 645.  The court held that

14  an individualized inquiry as to the facts and circumstances of each employee's

15  "missed" break on each day at each location would have to be made in order to

16  determine liability.  *Id.* at 646.  *See also*, *Salazar, et al. v. Avis Budget Group, Inc.,*

17  *et al.*, 251 F.R.D. 529 (S.C. Cal. 2008); *Gabriella v. Wells Fargo Financial, Inc.*,

18  2008 WL 3200190 (N.D. Cal. 2008)(denying class certification because employers

19  liability turns on whether meal periods were made available and individualized

20  issues predominate regarding the reasons why breaks were missed);*Perez v. Safety-*

21  *Kleen Systems, Inc.*, 253 F.R.D. 508, 514 (N.D. Cal. 2008) (Section 512 does not

22  require employers to ensure that employees actually take meal breaks.); *Kohler, et*

23  *al. v. Hyatt Corp.*, 2008 U.S. Dist. LEXIS 63392 (C.D. Cal. 2008) (denying class

24  certification on meal break claim because an individualized inquiry was necessary

25  to determine whether employees were forced to forgo meal breaks).

26       **2.    Plaintiffs Cannot Show Commonality Under FRCP 23(a)(2).**

27       Plaintiffs cannot establish the existence of common issues, as is required by

28  FRCP 23(a)(2).  In *Kohler, et al. v. Hyatt Corp.*, 2008 U.S. Dist. LEXIS 63392

16

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.2

1   (C.D. Cal. .2008) at *14-*15, this Court held that the plaintiffs failed to

2   demonstrate common questions of law or fact because they did not provide

3   admissible evidence showing that employees other than those who worked in the

4   same location as the named plaintiffs regularly missed meal breaks. Here,

5   Plaintiffs have not presented admissible evidence showing that employees other

6   than Plaintiffs and other former Drivers regularly missed meal breaks, let alone

7   that Domino's failed to provide those breaks. In fact, Plaintiffs have presented *no*

8   *evidence* that any Driver at the NCASCC ever missed a meal period or that meal

9   periods were not provided at that facility. The evidence shows that many Drivers

10  and Route Pros regularly took meal breaks.[94] Moreover, the actual route data

11  shows that there was ample time to do so. Under these circumstances, there is no

12  common question of law or fact regarding whether meal periods were missed.

13         Plaintiffs erroneously argue that common issues exist because Domino's

14  "admits" to not paying premium pay for "missed" meal breaks. Domino's does not

15  owe premium pay for "missed" meal breaks. An employer is liable for premium

16  pay only if it forced employees to work through a break. *See, e.g.*, *Brown*, 249

17  F.R.D. at 587; *White*, 497 F. Supp. 2d at 1088-89. Even if putative class members

18  missed a meal period, whether they were forced to do so is an individual issue.

19         Likewise, Plaintiffs cannot manufacture a common issue by claiming that

20  Domino's had a policy of failing to provide meal breaks because meal breaks are

21  not specifically listed on driver logs. Plaintiffs incorrectly assert that Domino's

22  disputes the accuracy of its driver logs and allege that Domino's was aware that

23  putative class members missed meal breaks because breaks are not listed on the

24  driver logs. Plaintiffs' assertion demonstrates a misunderstanding of the

25  differences between "on-duty" time under the DOT regulations and "on-duty" time

26  _____

27  [94] Declaration of Eric Franco ("E. Franco Dec.") ¶ 6; P. Franco Dec. ¶ 5;
    Declaration of Ramsin Isayo ("Isayo Dec.") ¶ 7; Declaration of Mauricio Lara

28  ("Lara Dec.") ¶ 5; A. Lopez Dec. ¶ 8; Phillips Dec. ¶ 5; Declaration of Scott Wiles
    ("Wiles Dec.") ¶ 5.

1   under the Labor Code.  Pursuant to Section 395.2 of the Federal Motor Carrier

2   Safety Handbook, Domino's driver logs are required to include all on-duty time,

3   which includes stops along the routes.  On-duty time, for purposes of the DOT

4   regulations, includes meal break time.  Although those meal breaks may be off-

5   duty for purposes of Section 512, they are on-duty for purposes of DOT

6   regulations.[95]  Moreover, regardless of whether or not Domino's was aware that

7   certain Drivers did not take meal breaks on particular occasions, Domino's does

8   not owe premium pay for those missed meal periods if putative class members

9   chose to work through those breaks.  Again, whether Drivers and Route Pros

10  voluntarily elected to skip a meal break is an individualized issue and not subject

11  to collective proof.

12          Plaintiffs' further attempt to manufacture a common issue by claiming that

13  Drivers are pressured to skip meal breaks because Domino's supposedly

14  disciplined Drivers who failed to complete their routes within 14 hours.  There is

15  no evidence to support such a claim.  Drivers were <u>not</u> disciplined for failing to

16  complete their routes within 14 hours.  Instead, Drivers were only subject to

17  disciplined when they <u>kept driving</u> beyond the 14-hour limitation.  Drivers were

18  disciplined only for breaking the law – driving over the legally-permissible 14

19  hours – not for being unable to complete their route within 14 hours.[96]  Plaintiffs

20  cite write-ups that Pedroza received as purported evidence that Drivers were

21  disciplined for not completing their routes within 14 hours.  However, as apparent

22  on their face, Pedroza was not disciplined for failing to complete his route in 14

---

[95] DOT regulations do not allow meal periods to be excluded from on-duty time unless: (1) the driver is relieved of all duty and responsibility to care for the vehicle and its accessories; (2) the break is of "sufficient duration to ensure that the accumulated fatigue resulting from operating a CMV (commercial motor vehicle) will be significantly reduced; (3) the duration of the break was made known to the driver in writing by the employer prior to dispatch; and (4) during the stop the driver must be at liberty to pursue activities of his own choosing and is free to leave the premises where the vehicle is situated.  Deposition of Bulmaro Alcazar ("Alcazar Dep.") 113:13-115:14.

[96] Charbonneau Dec. ¶ 20.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  hours.  He was written up for having more than 14 hours of DOT driver time

2  without an intervening ten hours of rest.[97]

3      **3.      Individualized Issues Predominate Over Any Common Issues.**

4      Domino's lawful policy is to allow Drivers and Route Pros to take 30-

5  minute breaks for every five hours worked.  Domino's tells Drivers to stop

6  whenever they are hungry or tired.[98]  Domino's has submitted numerous

7  declarations from putative class members at both the NCASCC and the SCASCC

8  attesting to the fact that they knew they could take breaks and actually did take

9  those breaks.  For example, one SCASCC Driver stated, "I do take my lunch break

10  because I understand that it is company policy that I take such a break."[99]  A

11  NCASCC Driver acknowledged that, "When I became a Driver, Domino's told me

12  to pull over and take 30-minute meal breaks and I have never been pressured not to

13  take a break."[100]

14      The key issue with respect to whether common issues predominate is why

15  putative class members who did not take a meal break skipped their meal break.

16  Plaintiffs claim that some Drivers skipped their off-duty meal period and ate in the

17  truck because were told not to stop by certain SCASCC managers.  Only some of

18  Plaintiffs' declarants make such a claim.  Others, including Plaintiff Pedroza admit

19  that they were never told that they could not stop.[101]  Significantly, the managers

20  Plaintiffs allege told putative class members that they should not stop for meal

21  breaks worked only in SCASCC.  Plaintiffs have presented no evidence that

22  Drivers at the NCASCC were ever told that they cannot take breaks.  In fact,

23  Drivers from the NCASCC have confirmed that no one ever told them that they

24  were not permitted to stop for meal breaks.[102]

25  _____

26  [97] Charboneau Dec. ¶ 20.
    [98] Charboneau Dec. 19.
    [99] P. Franco Dec. ¶ 5.

27  [100] Miguel Dec. ¶ 7.
    [101] Pedroza Dep. 125:10-19; P. Franco Dec. ¶ 6; Miguel Dec. ¶ 7; Phillips Dec. ¶ 5.

28  [102] Miguel Dec. ¶ 7; Phillips Dec. ¶ 5.

19
DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1      Plaintiffs also claim that Domino's failed to provide meal periods by failing

2 to adequately disseminate its meal period policy.  The evidence, however, shows

3 that putative class members were aware that they were entitled to meal breaks and

4 were told to take meal breaks.[103]

5      Plaintiffs' main argument is that Drivers were under too much pressure to

6 finish their route if they took meal periods.  Actual route data, however, shows that

7 routes were completed well under DOT limitations and there was ample time to

8 take multiple breaks.  For instance, Drivers on Single-Driver, non-layover routes

9 had, on average, more than four hours of available drive time when they completed

10 their route.[104]  Likewise, Drivers on team routes had, on average, between five and

11 14 hours of available drive time when they completed their route.[105]

12      Consistent with this data is testimony from putative class members who ran

13 routes with Plaintiffs.  One Driver testified that he ran a route with Plaintiff

14 Espinoza two or three times and they stopped for no less than 30 minutes for meals

15 each.[106]  Other putative class members who ran routes with both Plaintiff Espinoza

16 and Plaintiff Pedroza testified that they stopped for meals with both Plaintiffs.[107]

17      Plaintiffs argue that even if they were able to finish their routes under the

18 DOT limits, they never knew by the fifth hour if they had time to take a break.

19 First, this ignores the fact that the Drivers ran routes for months at a time and were

20 extremely familiar with their routes and the traffic patterns.  Most importantly,

21 however, there is no requirement that meals be provided within the first five hours

22 of a shift.  *Brinkley*, 84 Cal. Rptr. 3d 881.  Even if there were a five-hour

23 requirement, whether individual Drivers knew whether they could take a meal

24

---

25 [103] *See e.g.*, P. Franco Dec. ¶ 5; Isayo Dec. (knows that he is entitled to meal breaks under the DOT Regulations); Lara Dec. ¶ 5 (knows its company policy to take

26 meal breaks each day); Namo Dec.¶ 5 (knows he is entitled to stop for lunch breaks).

27 [104] Schwartzenberger Dec. ¶ 10.
[105] Schwartzenberger Dec. ¶ 10.

28 [106] Declaration of Edgar Diaz ("Diaz Dec.") ¶ 7.
[107] M. Lara Dec. ¶ 6; A. Lopez Dec. ¶ 9.

within the first five hours on any particular day and still finish within DOT limits is an inherently individualized issue based on a number of factors, such as the Driver's experience, the amount of product to be delivered, traffic patterns, the type of route, and even weather conditions.  These factors render this cause of action inappropriate for class treatment.

For Drivers who did not take off-duty meal periods, the reasons are highly individual.  For example, Dean Sherman testified, "I don't stop for a 30-minute break because I'd just rather get home faster.  I feel like it should be my choice whether I want to stoop for a full 30 minutes or just grab something along my route so I can get home faster."[108]  Other Drivers' practice vary from shift to shift as to whether they take an off-duty meal break.  For example, George Miguel testified that he may skip an off-duty break and stay in his truck and eat if the weather is bad and he does not want to go outside to get food.[109]  Likewise, Alberto Lopez usually stops for off-duty meal periods, but may occasionally chose to eat in his truck if he wants to get home earlier on a particular day, rather than "waste time sitting in a restaurant."[110]  The individualized issues required to determine why any particular Driver did or did not take a break on any given day vastly outweigh any common issues in this case.

## C.  Plaintiffs' Claim for Unpaid Wages Cannot Be Certified

### 1.  The Named Plaintiffs' Claims for Unpaid Wages Are Not Typical of the Putative Class

The named Plaintiffs cannot establish that their claims for unpaid wages are typical of those of the putative class.  Plaintiffs claim that Domino's did not pay Drivers for pre and post trip inspections because that time was not separately listed on wage statements prior to 2006.  Even assuming that this were true (which it is not), neither was a Driver during the time period when payment for pre- and post-

---

[108] Sherman Dec. ¶ 11.
[109] Miguel Dec. ¶ 7.
[110] Lopez Dec. ¶ 7.

1   trip inspections were allegedly not paid.  The evidence demonstrates that in

2   September 2005, Domino's modified its payroll codes to begin listing time for pre-

3   and post- trip inspections under a separate payroll code from the payroll code used

4   for listing drive time compensation.[111]  Neither named Plaintiff was a Driver prior

5   to September 2005.  Plaintiff Espinoza started as a Driver in early 2006 and

6   Plaintiff Pedroza started as a Driver later in 2006.[112]  As such, Plaintiffs did not

7   suffer the alleged injury of not being paid for pre and post trip inspections and are,

8   therefore, inadequate class representatives for this claim.

9   **2. Plaintiffs Fail To Provide Evidence That Unpaid Wages for**

10  **Pre- and Post-Trip Inspection Is a Common Issue**

11          Class certification also must be denied because Plaintiffs' only evidence of

12  this claim comes from a single witness, Sam Pattee, who states that he complained

13  about pre- and post-trip inspections being unpaid and assumes that they were

14  unpaid because Domino's subsequently began listing pre- and post-trip inspection

15  time on wage statements.  However, as explained, payment for pre- and post-trip

16  inspections was factored into rates used to determine weight and mileage pay prior

17  to September 2005.[113]  Plaintiffs have presented no actual evidence that this time

18  was unpaid simply because it was not separately listed on wage statements.

19  Pattee's erroneous assumption is insufficient to give rise to class wide claims of

20  off-the-clock work.

21  **D. Class Certification of Plaintiffs' Wage Statement Claim Is Improper**

22  **Because Individualized Issues Predominate**

23          Plaintiffs allege putative class claims under Labor Code § 226 on the

24  grounds that Domino's wage statements supposedly fail to list premium pay for

25  "missed" meal periods and fail to list time for pre- and post-trip inspections.  These

26  allegations fail to establish a basis for class certification.  First, to the extent

---

27  [111] Charboneau Dec. ¶ 10.
28  [112] Pedroza Dep. 14:24-15:14.
    [113] Charboneau Dec. ¶ 10.

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION
LA1 6754071.2

1  Plaintiffs' Section 226 claim is predicated on the allegation that Domino's failed to

2  list premium pay for missed meal breaks, this claim cannot be certified for the

3  reasons set forth above which prevent certification of the underlying meal period

4  violation claim.  To the extent Plaintiffs base their wage statement violation claim

5  on the alleged failure to list compensation for all hours worked associated with pre

6  and post trip inspections, this claim fails because it is barred by the applicable one

7  year statute of limitations.

8         The statute of limitations for penalties under Section 226 is one year.  CCP §

9  340.  Plaintiffs' off-the-clock claims are based on their erroneous assertion that

10  Domino's failed to separately list out and pay for pre and post-trip inspections

11  through 2005.  The Complaint was filed in 2007, however, their off-the-clock

12  claim was asserted only in the First-Amended Complaint filed in November 2008.

13  Thus, the statute of limitations for their Section 226 claim based on their off-the-

14  clock allegations only extends until November 2007, almost two years after the

15  practice complained of was discontinued.

16         **1.    Recovery Under Labor Code § 226 Requires Actual Injury.**

17         Section 226(e) sets forth the requirements to recover monetary damages for

18  violations of Section 226(a):

19         (e) An employee <u>suffering injury</u> as a result of a <u>knowing and
           intentional failure</u> by an employer to comply with subdivision (a) is
20         entitled to recover the greater of all actual damages or fifty dollars
           ($50) for the initial pay period in which a violation occurs and one
21         hundred dollars ($100) per employee for each violation in a
           subsequent pay period, not exceeding an aggregate penalty of four
22         thousand dollars ($4,000), and is entitled to an award of costs and
           reasonable attorney's fees.
23
24  (emphasis added).  Damages and penalties are <u>not automatically</u> recoverable for a

25  violation of Section 226(a).  Rather, a prerequisite to recovering damages for a

26  wage statement omission that violates Section 226(a) is that the employee shows

27  that he or she "suffer[ed] injury" as a result of the employer's "knowing and

28  intentional failure" to comply with Section 226(a).

1    In *Brinkley*, the California Court of Appeal explained that employees must

2    suffer <u>actual</u> injury in order to recover under Section 226(a).  In that case, the wage

3    statements at issue contained inaccurate information concerning the employee's

4    mileage earnings rate.  84 Cal. Rptr. 3d at 880.  Nonetheless, the court upheld

5    summary judgment for the employer because the plaintiff had not demonstrated

6    actual injury based on the wage statement.  *Id.* at 880-881.  The court reasoned that

7    the error did not result in the loss of pay and that employees were given sufficient

8    information to determine whether they had been correctly paid.  *Id.* at 880-881.

9    *See also*, *Elliot v. Spherion Pacific Work, LLC*, 572 F. Supp. 2d, 1169 (C.D. Cal.

10   2008)(rejecting argument that any violation of 226 automatically triggers

11   entitlement to damages and holding that plaintiff must have suffered actual injury

12   to recover).

13                    **2.    Whether Putative Class Members Suffered Actual Injury Is**

14                           **an Individualized Issue.**

15   In the instant matter, there is no class-wide injury with respect to Domino's

16   wage statements.  Determining whether any putative class member supposedly

17   suffers injury because his wage statement failed to list premium pay for missed

18   breaks is an inherently individualized inquiry.

19                    **3.    Plaintiffs' Wage Statement Claims Are Not Typical.**

20   Plaintiffs' wage statement claims are not typical of the putative class

21   because they conceded that they were not injured by any alleged inaccuracies in

22   their wage statements. For example, Pedroza testified that he could not recall any

23   inaccuracies to his wage statement.[114]

24   **E.    A Class Action Is Not The Superior Method for Litigating These**

25          **Claims.**

26   In order to obtain class certification for any of their claims, Plaintiffs must

27   prove that "a class action is superior to other available methods for fairly and

28   ───────────────
     [114] Pedroza Dep. 137:2-15.

efficiently adjudicating the controversy." FRCP 23(b)(3).  One factor relevant to that determination is "the extent and nature of any litigation concerning the controversy already begun by or against class members" FRCP 23(b)(3)(B). There are currently two other pending matters brought by putative class members involving the substantially similar claims as those raised here.[115]  These actions show that putative class members have sufficient incentive to bring their own actions and that a class action is not necessarily the superior means for resolving this controversy.

### F.    Plaintiffs Have Not Provided Evidence That They Will Adequately Represent the Interests of the Putative Class

Under FRCP 23(a)(4), Plaintiffs bear the burden of establishing that they are adequate representatives for the putative class.  The factors Plaintiffs cite - appearance for a noticed deposition, attendance at mediation, and willingness to speak with their counsel - alone do not qualify them to act as class representatives. Further, adequate class representatives must have suffered the same injury as the putative class members. *General Telephone of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982).  Here, with respect to the claim for unpaid wages for pre- and post-trip inspections, Plaintiffs have not suffered the same injury that they allege on behalf of the putative class.  Similarly, Plaintiffs have never worked at the NCASCC and have presented no evidence of commonality between the SCASCC and the NCASCC.  At a minimum, Plaintiffs are therefore inadequate representatives for their claim for unpaid wages and for all claims on behalf of NCASCC employees.

---

[115] *Alcazar v. Domino's Pizza, LLC*, Riv. Sup. Ct. Case No. CIVRS 705269 and *Ibarra v. Domino's Pizza Distribution, LLC*, U.S. Dist. Ct. Case No. EDCV 08-0070 VAP (OPX).  Both cases include claims for failure to provide meal and rest periods, inaccurate wage statements, and failure to pay all wages due upon termination.

1    DATED:  November 24, 2008          SEYFARTH SHAW LLP

2

3                                        By
                                            _____
4                                            Andrew M. Raley
                                             Hayley E. Macon
5                                        Attorneys for Defendant
                                        DOMINO'S PIZZA, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOMINO'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LA1 6754071.1

**PROOF OF SERVICE**

STATE OF CALIFORNIA     )
                          )  ss
COUNTY OF LOS ANGELES )

     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Seyfarth Shaw LLP, 2029 Century Park East, Suite 3300, Los Angeles, California 90067-3063.  On November 24, 2008, I served the within documents:

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

☐    I sent such document from facsimile machine (310) 201-5219 on June 26, 2008.  I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (310) 201-5219 which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    electronically by using the Court's ECF/CM System.

Michael Malk, Esq.
MALK LAW FIRM
1180 S. Beverly Drive
Suite 600
Los Angeles, CA  90035

     I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than on day after the date of deposit for mailing in affidavit.

     I declare that I am employed in the office of a member of the bar of this court whose direction the service was made.

     Executed on November 24, 2008, at Los Angeles, California.

_____
Heidi Schmid

LA1 6668096.1